UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

UNITED STATES OF AMERICA                    CRIM. ACTION NO. 3:25-00082-01

VERSUS                                      JUDGE TERRY A. DOUGHTY

DONALD KELLY (01)                           MAG. JUDGE KAYLA D. MCCLUSKY

REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 30] filed by Defendant Donald Kelly.   For reasons stated below, IT IS RECOMMENDED that the motion be DENIED.

Background

On an unspecified date, a confidential source ("CS," sometimes referred to in the record as a "CI" or an "RCI") told City of Monroe Police Officer, Anthony Cowan ("Agent Cowan" or "Cowan") that she could purchase four ounces of methamphetamine from Donald Kelly ("Kelly"), who resided on Bailey Street, West Monroe, Louisiana.   On April 2, 2024, Officer Cowan recruited the CS to arrange a meeting with Kelly to purchase four ounces of methamphetamine for the sum of $600.   Cowan equipped the CS with audio and visual recording equipment to document the drug exchange, which ultimately occurred at 20:18, on April 2, 2024, in the front seat of Kelly's black SUV, in the parking lot of the Arena Pool Hall, roughly two blocks from Kelly's residence at 1206 Bailey Street.

Immediately prior to the transaction, Ouachita Parish Sheriff Deputy Joshua Dooley ("Agent Dooley" or "Dooley") observed the black SUV travel to the residence at 1206 Bailey Street, where someone exited the vehicle, entered the house, and, then, two minutes later, a person, later identified by the CS as Kelly, returned to the SUV and proceeded directly to the

Arena parking lot where the transaction occurred.   After the sale, Kelly returned directly to the residence at 1206 Bailey Street.   That same evening, Officer Cowan applied for and obtained a search warrant for 1206 Bailey Street from the Honorable Scott Leehy, Fourth Judicial District Court Judge for the Parish of Ouachita, State of Louisiana.

The next morning, at 8:30 a.m., a SWAT team executed the search warrant at the 1206 Bailey Street residence, where they encountered three individuals:   Kelly; his cousin, Tommy Minnifield; and Kelly's auntie, "Louise."   After securing and removing the occupants from the home, the SWAT team searched the premises and discovered at least two bags of methamphetamine floating in the toilet, a firearm in Kelly's dresser plus another one behind it, and $20,000 in cash in and behind the dresser, including $560 in pre-recorded buy funds from the controlled purchase the night before.   While still at the scene, Cowan briefly interviewed Kelly, who took ownership of the items found in his bedroom.   At the police station, Cowan and Inspector Seth Cox questioned Kelly further and elicited his admission of ownership of the two firearms, the currency found in the dresser, and the methamphetamine found in the bathroom.

On April 2, 2025, a federal grand jury returned a four-count indictment against Kelly charging him with distribution of methamphetamine, possession with intent to distribute methamphetamine, prohibited person in possession of firearms, and possession of a firearm in furtherance of a drug trafficking offense, all in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii) and (B)(viii) and 18 U.S.C. §§ 922(g)(1) and 924(c)(1)(A).   The indictment also included forfeiture allegations.   At his June 12, 2025 arraignment, Kelly entered a plea of not guilty as to all counts.   (Minutes [doc. # 18]).

On August 27, 2025, Kelly filed the instant motion to suppress all evidence obtained from the April 3, 2024 search of the residence at 1206 Bailey Street, as well as the incriminating statements he made taking ownership of most of the contraband found at the residence.   Kelly

2

contends that the search warrant that Officer Cowan obtained for 1206 Bailey Street was invalid because there was an insufficient nexus between the controlled drug buy and the residence. He further asserted that the search warrant contained a false statement(s), which necessitated a *Franks* hearing. Kelly also argued that Officer Cowan coerced him into providing incriminating statements by threatening to jail his auntie and cousin if he did not take ownership of the contraband. In addition, Officer Cowan purportedly promised Kelly that, if he agreed to go to his office and cooperate with law enforcement, then he would not go to jail.

Kelly also filed a motion to disclose the identity of the reliable confidential informant, a/k/a, the CS, whom the agents enlisted for the controlled purchase. [doc. # 31]. Kelly asserted that the disclosure of the CS's identity, and the contents of any communications made by her, are relevant to his defense and essential to a fair determination of the charges against him.

On September 10, 2025, the Government filed responses to both the motion to suppress and the motion to disclose the identity of the CS. [doc. #s 33-34]. The Government initially argued that Kelly does not have standing to challenge the search of the residence because he stated that he merely was a guest. Alternatively, the Government urged the Court to deny the motion on the basis that it was subject to the good-faith exception. Regardless, the Government maintained that the search warrant was supported by probable cause. Finally, the Government stated that Officers Cowan and Cox did not make any false promises or threaten any unlawful arrests for the purpose of obtaining Kelly's confession.

On September 17, 2025, Kelly filed a reply brief in support of his motion to disclose the identity of the CS. [doc. # 35]. He asserted that the CS was directly involved in a controlled purchase of methamphetamine from Kelly, which was organized via a social media account and entailed a hand-to-hand transaction. Kelly stated that the CS's firsthand account was essential to challenge the credibility of the prosecution's evidence. He suggested that the CS could

3

provide information to show that the search warrant contained false statements, particularly regarding the surveillance of Kelly prior to the transaction.    Also, the CS could provide alternative perspectives on the controlled buy and the circumstances surrounding it.

On November 4, 2025, the Court held a hearing on Kelly's pending motions to disclose the identity of the CS and to suppress evidence.   (Minutes [doc. # 39]).   A transcript of the hearing was filed in the record on December 29, 2025.   (Transcript [doc. # 45] (hereinafter abbreviated to "Tr.," followed by the corresponding page number(s)).

At the hearing, the Court entertained testimony from a total of two witnesses, both called by the Government:   Officer Cowan[1] and Agent Dooley[2].   (Witness List [doc. # 40]). The Court received into evidence eight exhibits from the Government:

1) April 2, 2024 application and search warrant; plus April 3, 2024 search warrant return; Gov.'t Exh. 1 [doc. # 41-1];

2) April 3, 2024 Advice of Rights form; Gov.'t Exh. 2 [doc. # 41-2];

3) April 2, 2024 audio excerpt of telephone conversation from CS body recording camera; Gov.'t Exh. 3-001 [doc. # 41-3] (manual attachment);

4) April 3, 2024 video and mismatched audio recording of questioning of Kelly by Agents Cowan and Cox; Gov.'t Exhs. 4-7 [doc. # 41-3] (manual attachment); and

5) Google map of 1206 Bailey Street and Thomas Road, annotated at the hearing by Agent Dooley; Gov.'t Exh. 8 [doc. # 41-4].

The Court also received into evidence seven exhibits from Kelly:

1) Photographs of $20 bills found behind the dresser; Def. Exh. 1 [doc. # 42-1];

---

[1] Officer Cowan serves as a task force officer with the ATF and as a case agent with the Metro Narcotics Unit ("MNU").   (Tr. 5).

[2] Agent Dooley is employed by the Ouachita Parish Sheriff and is a task force officer with the Drug Enforcement Administration.   (Tr. 90).

2)  April 2, 2024 audio and video recording from the CS body cam divided into three files; Def. Exhs. 2-4 [doc. # 42-2] (manual attachment) (collectively, "CS-BC" followed by the timestamp).

3)  April 4, 2024, Report of Investigation ("ROI") prepared by TFO Seth Cox; Def. Exh. 5 [doc. # 42-2] (manual attachment);

4)  Photograph of a drawer; Def. Exh. 6 [doc. # 42-2] (manual attachment); and

5)  Agent Dooley body camera footage depicting April 3, 2024 execution of the search warrant at 1206 Bailey Street, West Monroe, LA; Def. Exh. 7 [doc. # 42-2] (manual attachment).

At the conclusion of the hearing, the Court applied the "three-pronged test" set forth in *United States v. Cooper*, 949 F.2d 737, 749 (5th Cir. 1991), and denied Kelly's motion to disclose the identity of the CS.   (Tr. 108-109).

On January 12, 2026, Kelly filed a supplemental brief in support of his motion to suppress, re-urging his prior arguments and again requesting a *Franks* hearing because the search warrant affidavit purportedly contained false or recklessly misleading statements material to probable cause.   (Def. Suppl. Brief [doc. # 48]).   Kelly added that his brief further supported his motion to disclose the identity of the CS, whose identity remained crucial for ensuring a fair trial and to adequately challenge the prosecution's evidence.   *Id*.

On February 3, 2026, the Government filed its post-hearing memorandum in opposition to the motion to suppress.   (Gov.'t Post-Hearing Memo. [doc. # 49]).

The matter is ripe.

**<u>Relevant Testimony and Evidence</u>**

**I.      The Controlled Purchase**

On an unspecified date, Agent Cowan reached out to the CS and asked her[3] who was supplying methamphetamine in the area.   (Tr. 29).   The CS replied that she could purchase methamphetamine from Donald Kelly.   (Tr. 6).   She explained that she had purchased methamphetamine from Kelly on prior occasions, and, consequently, knew that he charged $600 for four ounces.   (ROI; Tr. 6).   Accordingly, at the agents' behest, the CS contacted Kelly, via Facebook messages and Facebook audio, and arranged to purchase a quarter pound (112 grams) of methamphetamine.   (Tr. 6, 11, 31).    Kelly provided the CS with the location for the controlled purchase.   *Id*.

On April 2, 2024, at approximately 15:30, Agents Cowan and Cox met with the CS at a predetermined neutral location.   (ROI, pg. 1).   Based on information provided by the CS, which was confirmed by other sources,[4] the agents identified Kelly's residence as 1206 Bailey Street, West Monroe, Louisiana.   *Id*.; Tr. 74-75.   At approximately 15:50, TFO Matt Jones and MNU Agent Ryan Mahoney searched the CS's vehicle and found no contraband, money, or weapons. (ROI, pg. 1).   At 16:03, the CS contacted Kelly, but he said that he was "not around" and unable to meet until later.   *Id*., pg. 2.

At 18:39, the CS received a response from Kelly on Facebook Messenger instructing her to "go to the store," which, from prior purchase, the CS knew meant the convenience store at 1500 Bailey Street, West Monroe, Louisiana.   *Id*.; Tr. 52-53.   At approximately 19:00, MNU

---

[3] At least one witness used a female pronoun for the CS.  *See, e.g.*, Tr. 29.   Moreover, the CS's voice on the body camera is decidedly female.

[4] Kelly's driver's license and a law enforcement computer database both reflect that he resided at 1206 Bailey Street.   (Tr. 74-75).   Furthermore, during a traffic stop in April 2023, Kelly provided law enforcement with the Bailey Street address.   *Id*.

Agents Cowan and Ray Spoon again searched the CS for contraband. *Id*. Agents Cowan and Cox (or Spoon) provided the CS with $600 in "pre-recorded buy money" to make the purchase. (Tr. 31, 35, ROI, pg. 2).

At 19:14, Cowan outfitted the CS with a body-worn camera(s). (Tr. 7; CS-BC, 19:14). As Cowan was doing so, the CS stated that she had gone "inside the house" every time. (CS-BC, 19:14:19). Cowan confirmed with the CS that she was going to the "Bailey Street store." *Id*., 19:15:57. He also confirmed that if Kelly was not there, and, if she saw his black vehicle, then she was going to go to his house. *Id*., 19:16:00.

By 19:17, the CS had departed the neutral location with the officers and navigated the roughly five-minute drive to the "store." (CS-BC, 19:17-19:22:46; ROI, pg. 2). Agents maintained surveillance on the CS as she drove to the store and after she arrived there. (ROI, pgs. 1-2; Tr. 52).

At 19:23, the CS received a call from Kelly, who told her that he had left the area, but would make the transaction upon his return. (CS-BC, 19:23:32; ROI, pg. 2; Tr. 53-54).

At 19:32, the CS relocated her vehicle across the street to the parking lot of the Arena at 1411 Thomas Road, West Monroe. (ROI, pg. 2; CS-BC, 19:32). She also received a message from Kelly saying that he would be there in about 30 minutes. (CS-BC, 19:32:44; Tr. 57).

At 19:35, the CS complied with agents' instructions to drive down Bailey Street to see whether a black Tahoe in front of the residence belonged to Kelly. (CS-BC, 19:35:02). By 19:39, however, she had returned to the parking lot of the Arena. *Id*., 19:39:48. By 19:59, it was dark outside. *Id*., 19:59. Nevertheless, law enforcement agents kept eyes on the CS at all times. (Tr. 58-59, 65).[5]

---

[5] Several agents were involved in the surveillance of the CS. (Tr. 42). They included Agent Dooley, Sergeant Mahoney, Investigator Click, Investigator Cox, Detective Ray Spoon,

At 20:01, the CS called Kelly and told him that she was sitting at the Arena.   (CS-BC, 20:01:51).   Kelly told her that he was on Well Road but heading that way.   (CS-BC, 20:02).

At 20:10, MNU Agent Spoon observed a black SUV turn onto Bailey Street.   (ROI, pg. 3).   Likewise, Agent Klick, who was conducting surveillance of Kelly's residence observed a black SUV arrive and park in front of 1206 Bailey Street.   *Id*.   Even the CS remarked that she had just seen Kelly "slipsiding across Bailey Street." (CS-BC, 20:11).   *Id*.

At 20:12, Agent Dooley observed a male subject exit the vehicle at 1206 Bailey Street and enter the home through the front door.   (Tr. 93; ROI, pg. 3).   Because it was dark, he was unable to discern the individual's identity.   (Tr. 93).   Two minutes later, Dooley observed the individual reappear by the vehicle as if he had exited the house from the carport area.   (Tr. 93-94).[6]   The vehicle then headed west down Bailey Street back towards the Arena.   (Tr. 94-95; ROI, pg. 3).   At 20:14, Special Agent Andrew Laiche observed the vehicle arrive at the Arena parking lot.   (ROI, pg. 3).

At 20:16, the CS exited her vehicle and walked over to Kelly's vehicle.   (CS-BC, 20:16:28).   Special Agent Laiche watched the CS transfer vehicles and enter the front passenger seat of the vehicle operated by Kelly.   *See* ROI, pg. 3.   The suspect's face is briefly visible at 20:16:28.   (CS-BC).   At 20:19, the CS exited Kelly's vehicle and walked back to her own car.   *Id*., 20:19.   Kelly drove back to the residence at 1206 Bailey Street and entered the home through the carport.   (Tr. 94-95).

At 20:20, the CS left the Arena parking lot and traveled to a predetermined neutral location where she met with Agents Cowan and Cox at 20:28.   (ROI, pg. 3).   Agents

_____

Investigator Megan Russell, and DEA Special Agent Andrew Laiche.   *Id*.

[6] The house has a door in the vicinity of the carport that enters into Kelly's bedroom.   (Tr. 94).

maintained physical and electronic surveillance of the CS vehicle while she traveled.  *Id*.  The CS relinquished custody of two plastic bags of suspected methamphetamine to the agents.  *Id*.  No money or other contraband was found in the vehicle.  *Id*.  After the search was complete, the CS told the agents that Kelly had given her the methamphetamine in exchange for the prerecorded funds provided to her by the agents.  *Id*., pgs. 3-4.

## II.    The Search Warrant

On April 2, 2024, at 22:26, Agent Cowan applied for a search warrant for 1206 Bailey Street.  (Search Warrant App.; Gov.'t Exh. 1).  Cowan faithfully recounted the circumstances of the controlled buy between the CS and Kelly that occurred that evening.  *Id*.  He noted that Kelly had visited 1206 Bailey Street for a short period immediately before the transaction and that he then returned to the same residence immediately after the transaction.  *Id*.  Based on his training and experience working in narcotics, Cowan opined that Kelly went to 1206 Bailey Street to obtain the methamphetamine for the sale and then returned to the residence with the proceeds from the transaction.  *Id*.  Cowan also included details indicating that 1206 Bailey Street was Kelly's home address or residence.  *Id*.  Finally, Cowan noted that, according to the CS, she had conducted purchases from Kelly at this residence and that he still lived there.  *Id*.

Judge Leehy issued the search warrant that same evening.  (Search Warrant; Gov.'t Exh. 1).

## III.    Execution of the Search Warrant

The Ouachita Parish SWAT Team executed the search warrant the next day, April 3, 2024, at 8:45 a.m.  (Tr. 14).  Agents made contact with Kelly and two other subjects:  Kelly's cousin and his auntie.  (Tr. 14-15).

According to the timestamp on Agent Dooley's body cam, the SWAT team was at the 1206 Bailey Street residence at 8:17 and calling for those inside to exit with their hands up.

9

(JD-BC; Gov.'t Exh. 7).   At 8:18:53 Kelly came outside with his hands up.   *Id*.   He was placed in plastic handcuffs and turned over to Agent Cowan.   *Id*.   There was a black SUV in the driveway.   *Id*.

At 8:24:20 Tommy Minnifield exited the house.   *Id*.   The SWAT team entered the house at 8:26.   Four minutes later, Dooley is overheard stating that there were floating bags of meth in the toilet.   *Id*.

The search uncovered methamphetamine, THC pens, a small amount of marijuana, Xanax pills, fentanyl pills, two firearms, and a large amount of cash.   (Tr. 15).   Some of the buy money used from the controlled purchase was found in Kelly's bedroom.   (Tr. 16).   The cash totaled $23,700, which included $560 of buy money.   *Id*.   Agents also discovered two handguns inside Kelly's room.   *Id*.   One was found inside the dresser, and the other was behind the dresser.   *Id*.   The large amount of cash was found directly behind the dresser inside a sock.   (Tr. 16-17); *see also* Search Warrant Return; Gov.'t Exh. 1.

Cowan advised Kelly of his rights at the scene and advised him that if there was anything in the home to which no one claimed ownership, then everyone was going to jail.   (Tr. 17, 80).[7] Cowan stated that the basis for that statement was constructive possession of the contraband. (Tr. 17).   Kelly's auntie or great auntie was the owner of the house, but Kelly lived there.   (Tr. 18).   The fact that the auntie was the owner, potentially provided her with another connection to the drugs.   *Id*.

Tommy Minnifield was the other person living there, and he ultimately was charged with some of the drugs found there.   (Tr. 18).   Specifically, he was charged with possession of

---

[7] Cowan's interview at the scene of the arrest was not recorded because he did not have his body camera turned on.   (Tr. 80-81).

hydrocodone pills, Xanax pills, and fentanyl pills which were found in a bag that also contained Minniefield's Louisiana identification.   (Tr. 18-19).

Kelly admitted that the items inside the bedroom belonged to him and added that, "[t]hey didn't have nothing to do with it."   (Tr. 19).   Agents transported Kelly to Metro Narcotics where they interviewed him again.   (Tr. 19-20).

**IV.      Interview at Metro Narcotics**

Agents Cowan and Cox conducted a recorded interview of Kelly in a small room at Metro Narcotics on April 3, 2024.   (Tr. 19-20; Gov.'t Exhs. 4-7).   Agents explained an Advice of Rights form to Kelly, who then signed the document at 9:49 a.m.   (Advice of Rights form, Gov.'t Exh. 2; Recorded Interview, Gov.'t Exh. 4).   Kelly also initialed each paragraph of the form.   *Id*.; Tr. 21.

Agent Cowan told Kelly that he respected him, that he was not going to insult his intelligence, and they were going to "keep it real."   (Recorded Interview, Gov.'t Exh. 4). Cowan told Kelly that, "if it's not yours, I don't want to put you in jail for something that's not yours.   I don't want to go back and get the auntie on warrant on something that's not hers, and I don't want to arrest the other guy for the stuff that's not his."   (Tr. 83).   At that point, Kelly took ownership of everything in the back room and the methamphetamine in the toilet/bathroom. (Tr. 23-24, 83-84; Recorded Interview, Gov.'t Exh. 5).   He also admitted that the firearms were his and disclosed where he bought them from.   (Tr. 84).[8]   However, he unequivocally distanced himself from anything that was in the living room.   (Tr. 28, 83-84; Recorded Interview, Gov.'t Exh. 7).   Consequently, he was not charged with the other drugs in the residence.   (Tr. 28).

---

[8] He identified the caliber of at least one gun.   (Recorded Interview, Gov.'t Exh. 5).

Kelly was not interested in providing information about his supplier.   (Tr. 26).   Neither Cowan nor any other agent threatened Kelly or made him any promises.   (Tr. 26-27).   In fact, Kelly was laughing, happy, and joking throughout the interview.   (Tr. 27; Recorded Interview, Gov.'t Exhs. 4-7).

### Law and Analysis

**I.      Request for Hearing and Disclosure of CS's Identity**

In his post-hearing brief, Kelly renewed his request for a *Franks* hearing and the disclosure of the CS's identity.   However, the Court already has held an evidentiary hearing where Kelly had the opportunity to test the facts and circumstances behind the allegations set forth in the search warrant.   *See Franks v. Delaware*, 438 U.S. 154, 171 (1978).   He has not established any basis for a second hearing.   Accordingly, his renewed request for a *Franks* hearing is DENIED.

Furthermore, at the conclusion of the hearing, the Court denied Kelly's motion to disclose the identity of the CS.   In his latest brief, Kelly does not provide any new argument to support reconsideration of that determination.   In any event, he is not prejudiced because he knows or should already know the identity of the CS.   Her face briefly flashes across the screen in the surveillance video, and it also appears that her first name is mentioned.   Accordingly, Kelly's renewed request to disclose the identity of the CS is DENIED.

**II.     Fourth Amendment Principles**

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. CONST. AMEND. IV.   The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment.   *Dunaway v. New York*, 442 U.S. 200, 207

(1979). "The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution." *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006).

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citations omitted). Evidence obtained in violation of the Fourth Amendment is generally excluded and "cannot be used in a criminal proceeding against the victim of the illegal search or seizure." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct. By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "'the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused.'" *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)). However, the exclusionary rule is not without limits, and suppression of evidence should be "ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.*

## III.    Standing

The Government initially contends that, if the Court were to credit Kelly's argument that he merely was a guest at 1206 Bailey Street, then he potentially does not have standing to contest the search of the home. The Supreme Court has held that the "capacity to claim the protection

of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Parks*, 684 F.2d 1078, 1082 (5th Cir. 1982). A subjective expectation of privacy is legitimate if it is "one that society is prepared to recognize as reasonable." *Rakas*, 439 U.S. at 143-44. Furthermore, "[a] houseguest has standing to challenge a search of his host's home because the guest has a legitimate expectation of privacy there." *United States v. Solis*, 471 Fed. App'x. 409, 410 (5th Cir.2 012) (citing *Minnesota v. Olson,* 495 U.S. 91 (1990)).

Here, the Government adduced abundant evidence to show that Kelly resided at 1206 Bailey Street. *See* discussion, *supra*. Furthermore, agents observed Kelly return to the residence after the drug transaction on the evening of April 2, and they found him there the next morning when they executed the search warrant. Therefore, at minimum, it is more probable than not that Kelly spent the night at 1206 Bailey Street, which suffices to confer standing to contest the search.

## IV. Two-Step Search Warrant Analysis

The Supreme Court has held that a warrant is generally required for certain searches, most notably searches of the home. *United States v. Morton*, 46 F.4th 331, 335 (5th Cir. 2022) (en banc) (citation omitted). The warrant requirement upholds the notion that the "inferences which reasonable men draw from evidence to decide if probable cause exists should be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Id*. (citing *Johnson v. United States*, 333 U.S. 10, 14 (1948) (internal quotation marks omitted). While the warrant requirement imposes a pre-

14

search burden on law enforcement, it also confers a post-search benefit upon them because, even in doubtful or marginal cases, a preference is accorded to the lawfulness of the warrant.   *Id*. (citations omitted).

Deference to the judge issuing the warrant and the judicially created exclusionary rule's focus on deterring police misconduct resulted in the "good-faith exception to the suppression remedy . . ." *Morton*, 46 F.4th at 336 (citation omitted).[9]   Application of the good-faith exception is reflected in the first step of a two-step process for analyzing a motion to suppress evidence discovered pursuant to a search warrant.   *United States v. Sibley*, 448 F.3d 754, 757-758 (5th Cir. 2006) (citation omitted).   If this good-faith exception applies, then the inquiry ends. *Gibbs*, 421 F.3d at 357 (citation omitted).   If the good-faith exception does *not* apply, then the court must proceed to the second step of the analysis to determine whether the warrant was supported by probable cause.   *Id*.[10]

When an officer obtains evidence in an "objectively reasonable good-faith reliance" on a search warrant, the exclusionary rule's "deterrence rationale loses much of its force," and the evidence is admissible.   *Pope*, 467 F.3d at 916.   As the Fifth Circuit explained,

> [t]his is in part because an issuing-judge's probable cause determination, based on an underlying affidavit, is afforded great deference.   Of course, such deference is not boundless, but, where the officer's conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way.   Thus, when an officer acting with objective good faith has obtained a search

---

[9] Because the exclusionary rule is designed to deter misconduct rather than to punish the errors of judges and magistrates, "[e]vidence obtained during the execution of a subsequently invalidated search warrant is *not* excluded *if* the officer executing the warrant relied on it in good faith."   *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation omitted).

[10] If the warrant is not supported by probable cause, then the exclusionary rule requires courts to suppress evidence seized thereon.   *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (citation omitted).

> warrant from a judge . . . and acted within its scope, the officer cannot be expected
> to question the magistrate's probable cause determination . . .

*Gibbs*, 421 F.3d at 357–58 (internal citations and quotation marks omitted).

In short, "[f]or the good-faith exception to apply, the executing-officer's reliance on the issuing-judge's probable-cause determination and the technical sufficiency of the warrant must have been objectively reasonable." *Gibbs*, 421 F.3d at 358 (citation omitted). The good-faith inquiry "'is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Maggitt*, 778 F.2d 1029, 1035 (5th Cir. 1985) (quoting *United States v. Leon*, 468 U.S. 897, n.23 (1984)). Stated another way, "if it is plainly evident that a magistrate or judge had no business issuing a warrant, then police cannot objectively rely on the warrant." *Id*. (quoted source and internal quotation marks omitted).

Importantly, the good-faith exception asks "not whether the issuing judge made a proper determination of probable cause, but whether the agents reasonably relied on the judge's determination in light of the information set forth in the affidavit." *United States v. Pigrum*, 922 F.2d 249, 252-253 (5th Cir. 1991) (citations omitted).[11] Ultimately, a reviewing court will defer to an issuing judge's probable cause determination in signing a warrant unless:

(1)    the issuing-judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;

(2)    the issuing-judge wholly abandoned his judicial role in such a manner that no reasonably well trained officer should rely on the

---

[11] Thus, even if probable cause for a search warrant is founded on incorrect information, the evidence will not be excluded so long as the officer's reliance upon the information's truth was objectively reasonable. *Sibley*, 448 F.3d at 575 (citing *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir.2002)) (internal quotation marks omitted).

16

warrant;

(3)     the underlying affidavit is "bare bones" (so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable); or

(4)     the warrant is so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

*Gibbs,* 421 F.3d at 358 (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)) (internal quotation marks omitted); *see also Morton*, 46 F.4th at 336. The government bears the burden of demonstrating that the good-faith exception is applicable. *United States v. Gant*, 759 F.2d 484, 487-488 (5th Cir. 1985).

For the purpose of the second step of the search warrant analysis, probable cause exists when under the "totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). A magistrate requires only a substantial basis for concluding that a search will uncover evidence of wrongdoing. *United States v. Allen*, 625 F.3d 830, 840 (5th Cir. 2010) (citation omitted). Relatedly, "[w]hen an affiant relies upon information obtained from an informant, the affiant must provide sufficient information to allow the magistrate to determine, by reviewing the totality of the circumstances, whether the informant's information is sufficient to create probable cause." *United States v. Brown*, 567 Fed. App'x. 272, 282 (5th Cir. 2014) (citation omitted).

a)   The Good-Faith Exception

In response to Kelly's motion, the Government invoked the good-faith exception to the suppression remedy. Kelly contends that agents were not entitled to rely on the warrant in good faith because it contained false or reckless statements or omissions. He also argues that the

17

warrant was barebones because it failed to provide a sufficient nexus between the controlled buy

and the residence that was searched.   The Court will address each argument in turn.

> i)    *False Statements or Omissions*

The Fifth Circuit has recognized that,

> [u]nder the Supreme Court's decision in *Franks*, a search warrant must be voided if the defendant shows by a preponderance of the evidence that the affidavit supporting the warrant contained a false statement made intentionally or with reckless disregard for the truth and, after setting aside the false statement, the affidavit's remaining content is insufficient to establish probable cause.

*United States v. Ortega*, 854 F.3d 818, 825 (5th Cir. 2017) (citing, *inter alia*, *Franks*, 438 U.S. at

155-56).   In *Ortega*, the Fifth Circuit explained that the *Franks* inquiry effectively consists of

three questions, all of which must be met:   "First, does the affidavit contain a false statement?

Second, was the false statement made intentionally or with reckless disregard for the truth? And

third, if the false statement is excised, does the remaining content in the affidavit fail to establish

probable cause?"   *Ortega*, 854 F.3d at 826 (internal citations omitted).

Under a *Franks* analysis, "material omissions are treated essentially similar to claims of

material misstatements."   *United States v. Gonzalez*, Civ. Action No. 18-0482, 2018 WL

6174202, at *7 (S.D. Tex. Nov. 7, 2018), *R&R adopted,* 2018 WL 6173724 (S.D. Tex. Nov. 26,

2018) (citations omitted).   Moreover, the defendant must show more than mere "negligence or

innocent mistake" by the affiant.   *United States v. Ortega*, 719 Fed. App'x. 319, 323–24 (5th

Cir. 2018) ("*Ortega II*") (citations omitted).   However, "recklessness may be shown

circumstantially 'when reasons to doubt [the] information's veracity are obvious.'"   *Id*., at 324-

25 (citations omitted).

Kelly first emphasizes that there was a roughly three-and-one-half hour period between

18

15:50 and 19:16 when he was not under surveillance.   However, Agent Cowan did not suggest that agents maintained constant, all-day-long surveillance over Kelly.   Rather, agents watched Kelly visit his residence immediately before the transaction and observed him return directly afterwards.   Therefore, this alleged omission from the affidavit was not intentional, reckless, or material.

Kelly further argues that, because of darkness, agents could not whether Kelly carried any items with him from the house.   Again, however, Agent Cowan did not represent that agents observed Kelly carrying something when he left the home.   Moreover, four ounces of methamphetamine is small enough to fit inside a pocket.   (Tr. 76-77).   Therefore, the alleged omission of this detail from the search warrant affidavit is immaterial and neither intentionally nor recklessly misleading.

Finally, Kelly argues that agents could not confirm his identity from a distance and did not have any photos/video of his entry/exit from the home.   As to the latter point, the affidavit does not state that agents captured Kelly's movements to and from the house, via video or photographs.   Rather, the uncontroverted testimony confirms that agents personally observed him enter and exit the home.

Perhaps Kelly's best argument is that Cowan failed to disclose that, because of darkness, agents were unable to *visually* verify that he was the person they had seen entering, exiting, and then returning to 1206 Bailey Street.   Instead, they had to infer that the individual was Kelly based on evidence that the CS set up the transaction via the social media account, "Donald Kelly"; the CS's identification of Kelly as the person with whom she consummated the transaction; and the fact that the person they observed drove Kelly's black Chevrolet Tahoe to

19

the Arena and had entered, exited, and returned to the 1206 Bailey Street residence where Kelly resided.

In sum, there was ample evidence to support the inference that the individual who agents observed entering, exiting, and returning to 1206 Bailey Street was Kelly.   Consequently, the Court does not find that Agent Cowan intentionally or recklessly misrepresented that Kelly was the person that agents observed entering, exiting, and returning to the residence.

### ii)   Bare Bones Affidavit

When, as here, the government invokes the good-faith exception to the suppression remedy, a defendant's nexus challenge is analyzed as a bare bones affidavit.   *See, e.g., United States v. Norman*, 129 F.4th 874, 876 (5th Cir. 2025) (addressing nexus argument in the bare-bones affidavit context).   "Bare bones affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause."   *Morton*, 46 F.4th at 336 (citation and internal quotation marks omitted).   An affidavit is bare bones when it contains "'wholly conclusory statements' such as 'the affiant 'has cause to suspect and does believe' or '[has] received reliable information from a credible person and [does] believe.'"   *Id*. (citation and some internal quotation marks omitted).   "Whether an affidavit is a bare bones affidavit is determined by a totality of the circumstances."   *United States v. Robinson*, 741 F.3d 588, 597 (5th Cir. 2014) (citation omitted).

Upon review, the affidavit in this case is far from conclusory.   It is two pages in length, single-spaced, and sets forth facts depicting the controlled buy and its association with 1206 Bailey Street.   *Morton*, 46 F.4th at 337 (three-page affidavits that detail facts surrounding arrest and discovery of drugs have "some meat on the bones").

20

Furthermore, contrary to Kelly's argument, the affidavit does not fail to link 1206 Bailey Street with the controlled purchase.   "Facts in the affidavit must establish a nexus between the house to be searched and the evidence sought."   *Norman*, 129 F.4th at 876 (quoted source omitted).   "The nexus may be established through direct observation or through normal inferences as to where the articles sought would be located."   *Id*. (quoted source and internal quotation marks omitted).   Importantly, in the good-faith context, the court asks only "whether officers objectively could reasonably believe that there was" a nexus.   *Id*. (citations omitted).

Here, the affidavit alleged that the CS contacted Kelly via his social media account, "Donald Kelly," to set up a controlled purchase of 112 grams of methamphetamine for $600. Immediately prior to the transaction, the seller of the methamphetamine, later identified as Kelly, traveled to 1206 Bailey Street, where he briefly entered and exited the home before proceeding forthwith to the transaction site, and then returned directly to 1206 Bailey Street.   Separate sources confirmed that 1206 Bailey Street was listed as Kelly's residence.   Furthermore, Agent Cowan alleged that, based on his training experience in working narcotics, he had reason to believe that Kelly went to his residence to obtain the methamphetamine prior to the controlled purchase and then returned to the residence to store the proceeds from the transaction.   Finally, Agent Cowan stated that the CS had "conducted controlled purchases from Kelly at this residence and advised that he still lived there."[12]

At minimum, the foregoing facts provided sufficient grounds for the officers to reasonably believe that there was a nexus between the house to be searched and the evidence sought.   *See Norman*, 129 F.4th at 876 (among other facts, after a drug transaction, defendant

---

[12] The CS's reliability was confirmed by the controlled purchase on April 2, 2024.

drove directly to the house at issue and pulled into the garage, whereupon no one was seen leaving that night); *United States v. Weaver*, ___ F.4th ____, No. 25-60269, 2026 WL 900011, at *3 (5th Cir. Apr. 2, 2026) (affidavit contained sufficient detail that identified time frames of the drug buys; the address of defendant's residence; the type of drug; the controlled buy process; a conversation among the CI, defendant, and a named third individual; and the make and model of a vehicle driven by defendant); *United States v. Bell*, 832 Fed. App'x. 298, 301 (5th Cir. 2020) (affidavit stated that defendant had sold drugs to an undercover officer on three occasions; cars used in the transactions were seen at the residence; the residence was defendant's last known address; and, most significantly, defendant proceeded directly from the residence to a drug sale after he was called to arrange a transaction); *but see United States v. Wilson*, 153 F.4th 478, 486 (5th Cir. 2025) (affidavit was bare bones where it provided no information linking the criminal investigation for brandishing a firearm at a restaurant to the residence to be searched).

### iii) *Particularity*

Kelly further contends that the warrant was overbroad because it authorized an expansive seizure list that included, "[a]ny items your Affiant deems necessary to this investigation or any other investigations . . ."   Although Kelly failed to provide any authority to support his argument, he appears to raise the Fourth Amendment's particularity requirement which "demands that the place to be searched and the items to be seized be described with sufficient particularity so as to leave 'nothing . . . to the discretion of the officer executing the warrant.'" *United States v. Allen*, 625 F.3d 830, 834-35 (5th Cir. 2010) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)); *see United States v. Hill*, 19 F.3d 984, 987 (5th Cir. 1994) ("The warrant must be sufficiently definite so that the officer executing it can identify the property

22

sought with reasonable certainty.").

"In identifying the property to be seized, the agents are required to interpret the warrant, but are not obliged to interpret it narrowly."  *Hill*, 19 F.3d at 987 (quotations omitted).  "Stated differently, the particularity requirement requires the search warrant to describe the property to be seized with reasonable specificity, but not with elaborate detail."  *Id.*  The warrant itself must meet the particularity requirement, not the supporting documents.  *Evans v. Davis*, 875 F.3d 210, 219 (5th Cir. 2017).  A search pursuant to a warrant that does not satisfy the particularity requirement constitutes a "warrantless" search.  *Id.*  "When the Government conducts a search pursuant to a warrant that does not particularly describe the things to be seized, the appropriate remedy is for the court to exclude from the evidence in a later criminal action the items improperly taken.*"  United States v. Allen,* 625 F.3d 830, 835 (5th Cir. 2010) (citing *United States v. Cook,* 657 F.2d 730, 734 (5th Cir. 1981)).

In this case, however, the search warrant also authorized the seizure of:

- Any and all narcotics namely Methamphetamine.

- Any and all firearms or firearm parts.

- Any and all prerecorded buy money used during this investigation.

(Search Warrant; Gov.'t Exh. 1).  Therefore, with the exception of an Iphone, "THC vapes," and pills attributed to Kelly's cousin, the categories of items found during the search of 1206 Bailey Street were described with sufficient particularity on the search warrant.  *See* Search Warrant Return; Gov.'t Exh. 1.  Moreover, the search warrant referenced the supporting affidavit, which also appears to have been signed by the judge who issued the warrant, albeit on a separate page. *See* Search Warrant and Affidavit; Gov.'t Exh. 1).  In short, officers had an objective basis to

believe that the warrant was valid.   *See United States v. Allen*, 625 F.3d 830, 839 (5th Cir. 2010)

(distinguishing *Groh v. Ramirez*, 540 U.S. 551, 557–58 (2004) because, among other things, the

magistrate judge also signed the affidavit).

### iv)   No-Knock, Nighttime Warrant

Kelly further contends that the Fourth Amendment concerns in this case were amplified

by the fact that the warrant included a no-knock provision and authorized nighttime execution.

However, video confirms that agents executed the search warrant during daylight hours and that

they called the occupants out of the home before commencing the search.   Therefore, Kelly's

concerns are unfounded.   In any event, "suppression is not the appropriate remedy for a

violation of the constitutional knock-and-announce requirement . . . "   *United States v. Bryant*,

No. 21-60960, 2023 WL 119634, at *3 (5th Cir. Jan. 6, 2023) (citing *United States v. Bruno*, 487

F.3d 304, 305 (5th Cir. 2007).

### b)   Summation

The ultimate question presented by the good-faith exception is "whether the magistrate so

obviously erred that any reasonable officer would have recognized the error."   *Messerschmidt v.*

*Millender*, 565 U.S. 535, 556 (2012).   This Court is unable to conclude that any reasonable

officer would have recognized any alleged error(s).   Furthermore, there is no suggestion that the

officers and the judge conspired together to issue a deficient warrant.   Consequently, "even if

the warrant in this case were invalid, it was not so obviously lacking in probable cause that the

officers can be considered 'plainly incompetent' for concluding otherwise."   *Messerschmidt*,

565 U.S. at 556.   Accordingly, the good-faith exception applies, and the second step of the

suppression analysis is pretermitted.   *United States v. Nguyen*, 172 Fed. App'x. 558, 561 (5th

Cir. 2006); *Devaney*, 109 F.4th at 326 (the court proceeds to the second step, i.e., the probable cause determination, only if the good-faith exception is inapplicable); *Weaver*, 2026 WL 900011, at *4 (because the good-faith exception applies, the analysis ends).

In sum, the Court finds no constitutional violation associated with the application, issuance, or execution of the search warrant for 1206 Bailey Street.

## V.      Incriminating Statements

Kelly seeks to exclude from trial various incriminating statements that he made on April 3, 2024, both at 1206 Bailey Street during the execution of the search warrant, and then again at the police station.   He contends that, as a result of the preceding Fourth Amendment violation, the statements are "fruit of the poisonous tree."   He further argues that he did not voluntarily waive his right against self-incrimination because it was coerced via threats and/or a false promise made by Agent Cowan.   The Court will address each argument, in turn.

a)   Fruit of the Poisonous Tree

Having determined that the search warrant is subject to the good-faith exception, the Court necessarily concludes that there is no basis to suppress any of Kelly's statements as fruit of an antecedent Fourth Amendment violation.   *United States v. Needham*, Cr. No. 11-185, 2011 WL 13124280, at *8 (W.D. La. Oct. 26, 2011), *aff'd,* 546 Fed. App'x. 353 (5th Cir. 2013); *see also United States v. Pace*, 955 F.2d 270, 278 n.9 (5th Cir. 1992) (denial of the motion to suppress evidence seized at defendant's barn also disposes of his argument that the statements he made after the search of the barn and his arrest were inadmissible at trial).   Therefore, the predicate is missing, and Kelly's argument fails.

b)   Fifth Amendment/Due Process

25

The admissibility of pre-indictment confessions is regulated by both the Fifth Amendment Privilege against Compelled Self-incrimination ("Fifth Amendment") and the Due Process Clause of the Fifth and/or Fourteenth Amendments ("Due Process Clause").   The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . ."   U.S. CONST. AMEND. V.   In *Miranda v. Arizona*, the Supreme Court held that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (footnote omitted).

The central principle of *Miranda* is that, if the police question an in-custody suspect without informing him of the rights specified therein, then his responses cannot be introduced into evidence to establish his guilt.   *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984). "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.   Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility . . ." *Missouri v. Seibert*, 542 U.S. 600, 609 (2004) (footnote omitted).   Ultimately, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."

26

*Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

In addition, a criminal defendant is "deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession and even though there is ample evidence aside from the confession to support the conviction." *Lego v. Twomey*, 404 U.S. 477, 483-484 (1972) (citations and internal quotation marks omitted). The defendant is entitled to "object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." *Id*. (citation omitted).

The government must establish by a preponderance of the evidence the voluntariness of an incriminating statement and the *Miranda* waiver. *Colorado v. Connelly*, 479 U.S. 157, 169, (1986); *United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999) (citation omitted). "The statement must be voluntarily, knowingly, and intelligently made, and the individual confessing must be cognizant of the rights being abandoned and the potential consequences of doing so." *United States v. Santiago*, 410 F.3d 193, 202 (5th Cir. 2005) (citation omitted). The voluntariness of a waiver contemplates two distinct dimensions:

> [f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. Guanespen-Portillo*, 514 F.3d 393, 403 (5th Cir. 2008) (citation omitted).

A vital aspect of voluntariness is "the presence or absence of coercive behavior on the part of the government." *Weaver*, 2026 WL 900011, at *4 (citation omitted). Thus, "trickery or deceit is only prohibited to the extent it deprives the suspect of knowledge essential to his

27

ability to understand the nature of his rights and the consequences of abandoning them." *Id*. (citation and internal quotation marks omitted). Even a promise of leniency will not render a confession involuntary if the defendant's criminal background is such that he should have known the consequences of his statements. *See United States v. Santiago*, 410 F.3d 193, 202-03 (5th Cir. 2005). Furthermore, an officer's threat to arrest or charge a suspect's relative if he does not cooperate does not render a resulting confession involuntary, so long as the officer had a good-faith basis for arresting or charging the relative. *See United States v. Aguirre-Flores*, 464 Fed. App'x. 394, 395 (5th Cir. 2012) (citing *Allen v. McCotter,* 804 F.2d 1362, 1364 (5th Cir. 1986) and *United States v. Diaz,* 733 F.2d 371, 375 (5th Cir. 1984)). Ultimately, "[v]oluntariness depends upon the totality of the circumstances and must be evaluated on a case-by-case basis." *United States v. Rojas-Martinez*, 968 F.2d 415, 418 (5th Cir. 1992) (citation omitted).

Applying the foregoing considerations here, the undersigned finds that Officer Cowan advised Kelly of his *Miranda* rights prior to Kelly admitting that the items inside the bedroom belonged to him. (Tr. 17-19, 80). Cowan admittedly told Kelly that, "if there's anything in the house and nobody claims ownership, everybody is going to go to jail." *Id*. However, Cowan explained that the basis for his statement was constructive possession of the contraband because all three individuals apparently resided in the home. *Id*.

Kelly contends that Cowan promised him that he would not go to jail if he cooperated. However, no evidence was presented to establish this alleged promise. To the contrary, Cowan denied that any agent made any promises to Kelly. (Tr. 27). Even if a promise of leniency had been made, this was far from Kelly's first encounter with law enforcement, and he was well-acquainted with the criminal justice system. *See Santiago*, 410 F.3d at 202-03.

Furthermore, at the police station, agents again provided Kelly with his *Miranda* rights and ensured that he understood the provisions of the written waiver form. Nonetheless, Kelly executed the form and proceeded to answer the agents' questions. Cowan advised Kelly that he did not want to arrest Kelly's cousin or have to obtain a warrant for his auntie if the items found at the residence, in fact, were not theirs. (Tr. 83). Thereafter, Kelly admitted ownership of the items in the back room and the bathroom but denied knowledge of the items in the living room. *Id*.

The Court observes that the entire interview at the police station was cordial, respectful, and lighthearted, with reciprocal banter and laughter between the agents and Kelly. Furthermore, Agent Cowan had a good-faith basis for threatening to charge Kelly's family members based on a theory of constructive possession. At minimum, methamphetamine was found floating in the toilet of what appeared to be a bathroom shared by the home's occupants. *See United States v. Stewart*, 353 F. Supp. 2d 703, 707 (E.D. La. 2004) (officer's threat to arrest defendant's family members did not render his confession involuntary because there was a good-faith basis to charge them with narcotics possession based on crack cocaine found in the shared home). Moreover, charges *were* brought against Kelly's cousin for the items found in the living room that Kelly had disavowed.

Upon consideration of the totality of the circumstances, the Court finds that Kelly not only understood his *Miranda* rights, but also expressly and implicitly waived them by executing the written waiver and freely answering the officers' questions. *See Berghuis*, 560 U.S. at 388 (suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the

29

police).   The Court further finds that the Government has demonstrated the voluntariness of Kelly's statements by a preponderance of the evidence.

### Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 30] filed by Defendant Donald Kelly be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 16th day of April, 2026.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

30